**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | | |
|---|---|---|---|
| **LATONIA HARRIS** | : | | |
| 18 Ram Drive | : | | |
| Cameron, NC  28326 | : | | |
| | : | | |
| Plaintiff, | : | **CIVIL ACTION NO.:** | |
| | : | (Jury Trial Demanded) | |
| v. | : | | |
| | : | | |
| **RYAN MCCARTHY, SECRETARY,** | : | | |
| **UNITED STATES DEPARTMENT OF** | : | | |
| **THE ARMY** | : | | |
| 101 Army Pentagon | : | | |
| Washington, D.C.  20310-0101 | : | | |
| | : | | |
| Defendant. | : | | |
| _____ | : | | |

## COMPLAINT

Plaintiff, Latonia Harris ("Ms. Harris" or "Plaintiff"), by and through her undersigned

counsel, hereby brings this Complaint against Ryan D. McCarthy, Secretary of the United States

Department of Army ("Defendant"), by averring as follows:

## INTRODUCTION

1.       Ms. Harris, a former civilian Behavioral Health Care Facilitator and Registered

Nurse who was previously employed by the United States Department of the Army ("Army" or

"Agency"), files this lawsuit alleging discrimination in federal employment based on race and

color (African American/Black) and retaliation for having engaged in protected activity.

2.       Ms. Harris' claims are brought pursuant to Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. § 2000e *et seq*., 42 U.S.C. § 2000e- 16(c) (collectively referred to

as "Title VII") and 29 C.F.R. §1614.407. This action also seeks relief pursuant to 42 U.S.C.

§2000e- 3(a), as amended, which prohibits retaliation against an employee for engaging in protected activity.

3.      These claims, supporting facts and damages set forth in this action are referred to individually or, at times, collectively as the "Lawsuit."

## PARTIES

4.      Ms. Harris is a resident of the state of North Carolina, living at 18 Ram Drive, Cameron, NC 28326.   At all times relevant to this Lawsuit, Ms. Harris was employed by Defendant and was an "employee" within the meaning of Title VII.

5.      Defendant, Ryan D. McCarthy, is the current Secretary of the Army and therefore is an "employer" and agency or department head within the meaning of Title VII and its implementing regulations.

7.      The Army operates a primary care clinic known as the Linden Oaks Medical Home, located within the Womack Army Medical Center ("Womack Medical Center") in Fayetteville, North Carolina, U.S. Army Garrison in Ft. Bragg ("Linden Oaks Facility").

8.      At all times relevant to this Lawsuit, Ms. Harris was assigned to and worked for the Army at the Linden Oaks Facility.  Similarly, all the actors and individuals identified herein were also employees of the Army and/or assigned to the Linden Oaks Facility and/or Womack Medical Center during this period and were acting within the scope and course of their employment and authority.

## JURISDICTION AND VENUE

9.      Jurisdiction of this matter arises under 28 U.S.C. § 1331 with federal questions involving Title VII and other governing federal sector regulations.

10.     Venue is proper in the United States District Court for the Eastern District of Virginia under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), as the Army's principal office is located in Fairfax County, Virginia.

## ADMINISTRATIVE UNDERTAKINGS

11.     On or about November 15, 2019, Ms. Harris filed a formal complaint with USAG Ft. Bragg's Equal Employment Opportunity Office, alleging discrimination and harassment on the bases of race/color and retaliation.  The complaint was received by the Agency and assigned a Docket Number of ARBRAGG19AUG03212.

12.     On December 6, 2019, following the filing of the complaint, the Agency issued a letter of acceptance of the complaint for investigation.   Thereafter, the Agency retained an outside contract vendor known as Delany, Siegel, Zorn & Associates to perform an administrative investigation, and a Report of Investigation ("ROI") was later issued.

13.     Ms. Harris eventually requested a Final Agency Decision ("FAD") which the Agency issued on July 29, 2020.  The FAD denied all forms of relief to Ms. Harris.

14.     Ms. Harris has ninety calendar days in which to initiate a lawsuit in federal court following the issuance of the FAD.

15.     All conditions precedent necessary to file this Lawsuit have been met and this action is timely filed.

## FACTS

### Hiring and Collaborative Nature of Job Duties

16.     On or about March 18, 2019, Ms. Harris (African American/Black) was hired for the position of Nurse (Clinical/Ambulatory)(GS-0610-11) at the Linden Oaks Facility.  In

addition, Ms. Harris held the position of Behavior Health Care Facilitator ("BCHF"), which was a newly created position at the Linden Oaks Facility.

17.     The selection process for the BCHF position was rigorous and Ms. Harris successfully interviewed with more than four head nurses and behavioral health professionals before being extended an offer as a career track civilian employee for the Army under direct hire authority.

18.     As a registered nurse and BCHF, Ms. Harris was tasked with performing independent and clinical patient triaging in support of the primary care providers with the behavioral health arena, including assisting the clinic with patient and staff education and coordinating patient referrals to various support services, among an assortment of other leadership duties.

19.     The BCHF job description made clear that Ms. Harris was responsible for working "collaboratively" with the entire Linden Oaks Facility and nurse case manager within the Womack Medical Center, and providing comprehensive, coordinated care in connection with her duties.

20.     During her first month in the job, Ms. Harris performed exceptionally and met and exceeded the legitimate performance expectations of her supervisor and the physicians that she supported.

21.     Reflective of her excellent work abilities, Ms. Harris passed a BCHF evaluation on April 19, 2019, and was lauded by the reviewing physician for performing "excellent" work and for displaying demonstrated strengths in following patient call protocols, expert use of question modules, and the manner in which she provided patient education.

Disorganized Reporting Infrastructure

22.     At the time of her hire in the spring of 2019, Ms. Harris directly reported to Anthony Portee ("Mr. Portee"), who served as the Nursing Director.

23.     As the Nursing Director, Mr. Portee acknowledged that he managed all nurses within the Womack Medical Center, including Ms. Harris.

24.     The creation of the new BCHF position at the Linden Oaks Facility created both practical and directive challenges in terms of reporting infrastructure, authority and responsibilities.

25.     For instance, while the nursing director typically managed all nurses in some capacity, there was an Agency Medical Command policy in place stating that a BCHF must be supervised by a Clinical-Nurse-Officer-In-Charge ("CNOIC"), and rated by the Group Practice Manager ("GPM").

<u>Appointment of Amanda Paige as CNOIC</u>

26.     Upon information and belief, in or around April of 2019 the decision was made to appoint Amanda Paige ("Ms. Paige")(Hispanic/Caucasian) as the CNOIC at the Linden Oaks Facility, effectively making her Ms. Harris' new direct supervisor.   It was formally announced on May 1, 2019 that Ms. Paige was the new supervisor and CNOIC.

<u>Ms. Paige Foments a Racist Culture</u>

27.     Following her appointment, Ms. Paige moved quickly to install a hostile culture and campaign of fear, intimidation and sustained harassment in the Linden Oaks Facility against African American/Black employees, purposefully singling them out and targeting them for discipline and discharge.

28.     For example, on June 3, 2019, shortly after her appointment to CNOIC, Ms. Paige administered counseling to Ms. Harris for speaking and interacting collaboratively with others,

which was a normal practice within the Womack Medical Center and a direct responsibility as expressed in Ms. Harris's job description.

29.     Ms. Paige administered counseling to Ms. Harris despite the fact that she had done nothing wrong; was following the express dictates of her written job description; and was a relatively new employee who had been placed in a working environment that emphasized cross-collaboration and had overlapping lines of authority.

30.     While Ms. Paige attempted to cast this counseling as an example of Ms. Harris going behind her back, it instead served as a clear warning to Ms. Harris that she needed to stay in what Ms. Paige perceived as her proper place.

31.     During this same period, Ms. Paige similarly targeted and harassed other African American/Black subordinates for discipline and discharge, propelled by her racial animus and biases.

32.     On April 1, 2019, shortly after Ms. Harris was hired, the Agency assigned Montavia Oates ("Ms. Oates")(African American/Black) to be a Certified Nursing Assistant at the Linden Oaks Facility.

33.     Within weeks of being appointed CNOIC, Ms. Paige began mistreating and harassing Ms. Oates.  As with Ms. Harris, Ms. Paige's treatment of her was in stark contrast to how she treated non African American/Black employees. Ms. Paige went out of her way to create issues, impose write-ups and find reasons to castigate and fault Ms. Oates.  This singling out went so far as to result in Ms. Paige disciplining Ms. Oates for not being in the workplace when, in fact, she was present.

34.     Ms. Paige openly disparaged other African-American employees in the workplace, including but not limited to Ms. Ortiz (African American/Black), a respected

employee at the Linden Oaks Facility.  On numerous occasions, Ms. Paige remarked that Ms. Ortiz was not organized and did not have it together, despite the fact that Ms. Ortiz was recognized as having exceptional organizational skills.

<u>"You Smell and Have Body Odor"</u>

35.     In early June of 2019, Ms. Paige made a series of denigrating statements to Ms. Oates, at one point telling her she "stunk" and on at least two other occasions stating, "you smell and have body odor."

36.     Ms. Paige's comments reflect a woeful lack of respect and were meant to disparage Ms. Oates.

37.     Like Ms. Oates, Ms. Paige's discomfort with and dislike of Ms. Harris was obvious in her daily interactions.  Ms. Paige made a concerted effort to make Ms. Harris feel unwelcome at the Linden Oaks Facility.  Ms. Paige was verbally abusive to Ms. Harris and spoke to her in in a harsh exasperate tone.  On multiple occasions, Ms. Paige told Ms. Harris's co-workers (Caucasian) to avoid Ms. Harris and encouraged Ms. Harris' peers (all Caucasian) to provide negative information to her about Ms. Harris.

38.     Ms. Paige denied Ms. Harris the right to conduct in-services to clinical employees as contemplated by her job description, and purposely denied her training and an adequate workspace that was conducive for performing her duties as BCHF.  Ms. Paige would frequently overreact, manufacture and attempt to discipline Ms. Harris for any issue, and went out of her way to slander her to senior leadership in a manner designed to destroy her professional standing within the Womack Medical Center.

39.     In addition, Ms. Paige repeatedly lobbied for Ms. Harris' position to be eliminated with senior leadership, falsely insisting that there were not enough patients at the Linden Oaks Facility to warrant a BCHF.

### Your Option is to Transfer to Another Facility

40.     In addition to the open hostility Ms. Paige displayed toward African American/Black subordinates, she also displayed a pattern of aggression, hostility and retaliation towards any employee who reported wrongdoing, opposed discriminatory treatment, initiated EEO claims or otherwise engaged in protected activity.

41.     On July 11, 2019, Ms. Harris met with Ms. Paige and the GPM, Kevin Stiffarm ("Mr. Stiffarm), in an attempt to address certain critical safety concerns and failures with regard to the implementation of policies.

42.     Ms. Paige dismissed her concerns and proposed that Ms. Harris consider transferring to another facility, a suggestion that she made repeatedly to Ms. Harris in her quest to rid her from the Linden Oaks Facility.

### Elevating Concerns to Program Manager

43.     Having received nothing but indifference from Ms. Paige, on July 12, 2019, Ms. Harris elevated her concerns of local leadership wrongdoing to Dr. Svetlana Kahle ("Dr. Kahle").  Dr. Kahle was a senior behavioral health point of contact located in Washington, D.C., who held the title of Program Manager, Behavioral Health in Primary Care Transitional Intermediate Management Organization/ Defense Health Agency.

44.     Ms. Harris' whistleblowing reporting included allegations of leadership malfeasance in the program, in addition to Ms. Paige's mistreatment and failure to support Ms. Harris at the Linden Oaks Facility.

45.     Dr. Kahle thereafter committed to quickly investigate and address these issues with Dr. Ryan Withrow ("Dr. Withrow"), the Behavioral Health Care Coordinator, Ms. Paige and others at the Womack Medical Center.  Upon information and belief, Dr. Kahle and other senior leaders spoke to Ms. Paige and others about Ms. Harris' serious allegations on July 15, 2019.

46.     Ms. Paige was angered and outraged that Ms. Harris had the audacity to raise complaints regarding her actions and inactions with senior leadership.

47.     On July 16, 2019, the next morning, Ms. Harris arrived for work and reported to Ms. Paige's office to announce her schedule for the day (something Ms. Paige required of her but not her Caucasians coworkers).

48.     Ms. Harris reported, among other things, that she was scheduled to attend an important meeting that morning that had been scheduled between other BCHFs at the Womack Medical Center.

49.     Ms. Paige immediately exhibited intense hostility and aggression towards Ms. Harris, so much so that another staff member who was present in the office felt compelled to excuse himself from Ms. Paige's office.

50.     Ms. Paige raised her voice at Ms. Harris, ordering her not to attend the meetings and to remain at the clinic.

51.      Despite this, Ms. Paige did not give her further instructions or utilize Ms. Harris' services in the clinic that morning, further confirming that that decision to prevent her from attending a professional meeting of her peers was both punitive and retaliatory.

52.     Ms. Paige's actions further served to damage Ms. Harris' professional standing with leadership.

53.     Due to the stress, anxiety, humiliation and harassment caused by Ms. Paige's actions, Ms. Harris developed a migraine headache and had to leave the clinic and remain out of work until July 18, 2019.

<u>Manufacturing a Disciplinary Incident</u>

54.     Ms. Paige attempted to use this incident to manufacture false discipline against Ms. Harris accusing Ms. Harris of insubordination for her role and planned involvement in the July 16, 2019 meeting.

55.     Ms. Paige falsely informed senior leadership in the District of Columbia that Ms. Harris had gone over her head and contacted the "head" of the Information Management Department ("IMD").  However, this was highly misleading as Ms. Harris contacted the IMD help desk, which was a resource available to her as BCHF.

56.     Ms. Harris reached out to the IMD in June of 2019 with regard to certain perplexing record keeping and documentation issues in her position as BCHF.  She spoke to an individual named Sonia Wharton ("Ms. Wharton").

57.     Ms. Wharton had informed her that the solution to her documentation issue was complex, multi-faceted, multi-dimensional, and would require a meeting with the input of several players to help with the process and improve outcomes.

58.     As a result, another BCHF, Mary Richardson ("Ms. Richardson")(Caucasian), and BCHF Jesse Gambardella ("Ms. Gambardella") (Caucasian) requested that Ms. Harris suggest a time and circulate invites in the shared calendar for such a meeting.  The meeting was thereafter scheduled for July 16, 2019.

59.     The planned meeting was part of a normal and standard practice within the Womack Medical Center.  At the time, there were six BCHFs at Ft. Bragg.  These six BCHF's

10

frequently collaborated and coordinated on a variety of issues as required by their job descriptions.

60.     There were multiple meetings between the BCHFs each month, which often included other members of leadership, behavioral health professionals, and other staff members. The BCHFs all used a shared outlook calendar to coordinate such meetings.

<u>Negative Counseling- July 23, 2019</u>

61.     On July 23, 2019, Ms. Paige met with Ms. Harris and proceeded to counsel her. In the meeting, Ms. Paige accused her of insubordination because Ms. Harris requested the July 16, 2019 meeting.  Ms. Paige took this normal action and cast it as Ms. Harris supposedly seeking a meeting without authority and Ms. Harris taking on an unwarranted leadership role with her peers.

62.     During the meeting, Ms. Paige brought up Ms. Harris' whistleblowing activities.

63.     Contrary to Ms. Paige's false allegations, Ms. Harris was not attempting to assert a leadership role with her peers.  Rather, coordinating and attending meetings and training to better the processes used among the various BCHFs is a group effort and necessary to facilitate meaningful collaboration and is directly within the scope of Ms. Harris' job description, duties and responsibilities.

64.     Moreover, as known by Ms. Paige, it was Ms. Richardson and Ms. Gambardella who requested and directed Ms. Harris to schedule the meeting and circulate invites. Further, M. Pasquale Signorino ("Mr. Signorino"), a Clinical Workflow Analyst had also requested the meeting to assess current documentation processes.

65.     Upon information and belief, neither Ms. Gambardella nor Ms. Richardson received verbal counseling or other discipline for scheduling a meeting without permission or

authority, and neither was accused by Ms. Paige of insubordination or taking improper leadership roles.

### "Do You Feel Like I'm Discriminating Against Your Race"

66.    During her discipline meeting with Ms. Paige on July 23, 2019, Ms. Harris informed Ms. Paige that she believed her treatment of her was illegal and told her she had contacted the Agency's local EEO office to report the discrimination, harassment and mistreatment by Ms. Paige.

67.    Ms. Harris' statement was protected activity in that she was opposing the practices, harassment and treatment by Ms. Paige.

68.    After that meeting, Ms. Paige authored a memorandum admitting that they discussed Ms. Harris' intent to contact the Agency's local EEO office.  In this memorandum, Ms. Paige states, in relevant part, that she asked Ms. Harris, "[d]o you feel I am discriminating against your race."  The memorandum indicates that in response, Ms. Harris replied "…it is also work environment."

69.    Ms. Paige knowingly provided misleading information to leadership in the District of Columbia regarding Ms. Harris.

70.    Ms. Paige misrepresented to Dr. Withrow the purpose of the meeting was to effectuate changes to MEDCOM policies when, in fact, that was never the intent.  Ms. Paige purposely disparaged Ms. Harris' work performance and again complained to Dr. Withrow that there was not enough work to support her position.

71.    On July 24, 2019, Dr. Withrow met with all BHCFs to discuss the reasons for cancellation of the July 16, 2019 meeting.  Dr. Withrow repeated the information conveyed to him by Ms. Paige, and indicated that disciplinary actions were recommended.

72.     Through her misrepresentations and using her position of authority, Ms. Paige manipulated Dr. Withrow by providing false information to destroy Ms. Harris' reputation.  Ms. Paige cast Ms. Harris as an "angry black woman."  Yet, Ms. Harris was showing initiative and engaging in collaborative efforts as contemplated by her job descriptions and duties.  Ms. Paige controlled the narrative that resulted in leadership supporting her recommendation to discharge Ms. Harris.

73.     Although Dr. Withrow was not in Ms. Harris' direct chain of command, he had tremendous influence over her career insofar as he was the local overseer of the program and reported to senior leadership in the District of Columbia.

Initial EEO Contact

74.     Ms. Harris initiated her informal EEO contact with the Agency in late July of 2019 and informed Ms. Paige that she had done so.

Targeting, Discrimination and Reprisal against another African American/Black Employee

75.     In the midst of Ms. Paige's active campaign of harassment, discrimination and reprisal against Ms. Harris in June and July of 2019, she was simultaneously targeting Ms. Oates (African American/Black).  Ms. Oates was Ms. Harris' co-worker.  She and Ms. Harris conferred regularly about the harassment they experienced while working at the Linden Oaks Facility.

76.     In July of 2019, Ms. Oates arrived for work and Ms. Paige ordered her to check a patient into the system, despite the fact the patient had not physically arrived at the clinic. This was in violation of the policy.  Ms. Oates recognized that Ms. Paige's orders were designed to put her in a difficult position.  If Ms. Oates refused to do what Ms. Paige ordered, she would be reprimanded for not following that order.  Yet, if she did follow the order, she would be violating a policy.

13

<u>Raising False Patient Safety Issues as a Tool for Removal</u>

77.     Ms. Paige regularly brought up false patient safety issues against certain African-American/Black employees, knowing that the issue patient safety would provide support for discipline, up to and including termination.

78.     In or around July of 2019, Ms. Paige accused Ms. Oates of  leaving a patient alone, thereby placing the patient at risk.

79.     These allegations, however, were false and manufactured.  Ms. Paige was aware that Ms. Oates was in training with a preceptor at the time and was not the person assigned to that patient.

80.     Ms. Paige would later bring this up as justification to recommend termination.  A few weeks later Ms. Paige used a similar tactic against Ms. Harris.

<u>Ms. Oates EEO Contact; Illegal Discharge</u>

81.     As a result of the ongoing campaign of harassment and discrimination, Ms. Oates contacted the Agency's EEO office around the same period as Ms. Harris.

82.     On or about August 3, 2019, Ms. Oates informed Ms. Paige that she had made an appointment with an Agency EEO counselor to address Ms. Paige's discrimination and harassment.

83.     Ms. Oates' actions and statements were a form of protected activity in that she was opposing the discriminatory practices, harassment and treatment by Ms. Paige.

84.     Ms. Paige initially attempted to discourage Ms. Oates and pleaded with her to talk it over and discuss it.   Ms. Oates declined.

85.     Approximately three days later, on August 6, 2019, Ms. Oates was called into Ms. Paige's office.  When Ms. Oates entered, Ms. Paige slammed the door closed behind her.

86.     Ms. Paige then handed Ms. Oates a discharge paper and told her she was "not fit for Linden Oaks."  She then, forcibly removed a computer out of Ms. Oates' hands and directed security to remove her from the office and march her out of the building.

87.     Ms. Oates discharge and the manner in which it was handled was witnessed and/or known by Ms. Harris and everyone in the clinic, was a clear warning of what happens to those who complain.

<u>Ms. Harris' EEO Intake; Immediate Reprisal</u>

88.     On August 27, 2019, Ms. Harris utilized administrative leave to go to the Agency's EEO office, meet with an EEO counselor, file an intake questionnaire and submit other documents.

89.     The filing of the EEO complaint by Ms. Harris constituted protected activity under the Agency's EEO policies and the law.

90.     Ms. Paige was aware that Ms. Harris was in the process of filing a formal complaint of discrimination and had to sign off on Ms. Harris's leave request to attend a meeting at the Agency EEO office.

91.     The following day, on August 28, 2019, Ms. Paige forwarded an email falsely accusing Ms. Harris of stepping outside of the scope of her profession and failure to follow directives.  This was an act of reprisal.

92.     On August 29, 2019, Ms. Harris received notification that a meeting had been scheduled with the Program Manager.  Ms. Paige, subsequently, sent an email stating, in part: "[p]lease dial in for attendance to discuss job expectations.  This will assist everyone with being on the same page."

93.     Ms. Harris assumed that meeting with the Program Manager and Ms. Paige involved all BCHFs, but did not see the meeting listed on the shared outlook calendar.  Ms. Harris sent the notification to all other BCHFs as a reminder of the meeting.  However, Ms. Paige later informed her that the meeting would be private.

<u>Written Counseling- September 9, 2019</u>

94.     On September 9, 2019, less than two weeks after filing a formal EEO complaint, Ms. Paige administered a formal written counseling to Ms. Harris with a Memorandum with a subject line styled: "Written Counseling- Failure to Follow Instructions and Insubordination."

95.     The counseling was maliciously written in such a manner to make it appear as if Ms. Harris had a demonstrated history of insubordination.

96.     The counseling referred to an alleged verbal warning on April 25, 2019 wherein it was implied that Ms. Harris did not follow the chain of command.  However, Ms. Paige did not meet with Ms. Harris on April 25, 2019.  Moreover, the so-called failure to follow the chain of command was only Ms. Harris speaking with another colleague to try and collaboratively problem-solve an issue, which was a normal practice within Womack Medical Center and a direct responsibility as expressed in her job description.

97.     Ms. Harris was also shocked to see that she was being accused of insubordination for having shared with other BCHFs the scheduled meeting for August 29, 2019, which she initially believed to be a meeting for all BCHF's.  When Ms. Harris questioned the discipline, Ms. Paige lashed out angrily and said, "you tried to throw me under the bus."

98.     All of the alleged incidents of insubordination were nothing more than incidents wherein Ms. Harris was attempting to work collaboratively with others, which were within the scope of her duties, responsibilities and job description.

16

99.     The counseling concluded that any future incidents of a similar nature could result in removal from federal service.  The counseling was the proverbial "set-up," and was administered by Ms. Paige.  This counseling constituted additional harassment, discrimination and retaliation.

<u>Written Counseling- September 12, 2019</u>

100.     Just three days later, on September 12, 2019, Ms. Paige administered yet another formal written counseling to Ms. Harris with a Memorandum with a subject line, "Failure to Follow Care Facilitation Protocol.

101.     Following the playbook used to discharge Ms. Oates (African American/Black) a few weeks earlier, Ms. Paige falsely and maliciously accused Ms. Harris – a licensed registered nurse - of endangering the safety of a patient on three separate occasions dating back to July 15, 2019.  Yet, Ms. Paige had not addressed these so-called incidents at the time they had, supposedly, occurred.

102.     As with the earlier counseling on September 9, 2019, it was written in such a manner to make it appear as if Ms. Harris had a demonstrated history of jeopardizing patient safety when, in fact, she had not.

103.     In particular,  Ms. Harris was shocked to be accused of endangering a patient on September 6, 2019.  She thereafter re-read the patients chart, which confirmed that the patient was never in any danger caused by Ms. Harris.  At all times, the patient had a proper support system in place and the physician's instructions were followed.

104.     The counseling imposed by Ms. Paige was an act of further harassment, discrimination and retaliation.

<u>Ms. Paige Seeks to Terminate Ms. Harris- September 13, 2019</u>

105.    The next day, on September 13, 2019, Ms. Paige authored a Memorandum wherein she recommended that Ms. Harris be discharged from federal service.

106.    The Memorandum referred to Ms. Paige's unfounded prior discipline against Ms. Harris.

107.    One of the supporting Memorandum of disciplinary history was dated July 18, 2019, but contained incidents that allegedly took place on July 23, 2019.

108.    The proposed termination by Ms. Paige was an act of further harassment, discrimination and retaliation that was causal in period to her EEO complaint.

109.    On October 31, 2019, Ms. Harris was formally given her termination notice from the Agency, prompted by Ms. Paige.

110.    Ms. Harris' termination was effective on that same day, close of business.

111.    The discrimination, harassment, disparate treatment and acts of reprisal by the Agency employees and agents identified herein, and Ms. Paige in particular, caused Ms. Harris to sustain and continue to sustain, emotional pain, mental anguish, humiliation and embarrassment, damage to professional reputation and career development, and economic damages, among other indignities and harm.

**<u>COUNT ONE</u>**
**<u>RETALIATION- TITLE VII</u>**
<u>(Retaliation in the Terms and Conditions of Employment)</u>

112.    Ms. Harris incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

113.    At all times relevant to this Lawsuit, Ms. Harris was an "employee" and the Agency was an "employer" within the meaning of Title VII.

114.    During the period specified in the Lawsuit, Ms. Harris repeatedly engaged in protected activity by opposing, complaining and raising the Agency's illegal and discriminatory and harassing practices, including but not limited to the filing a formal agency EEO complaint.

115.    Title VII makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding.

116.    The Agency violated Ms. Harris's right to equal employment opportunity when it retaliated against Ms. Harris by taking material adverse actions against her, repeatedly thwarting his professional career advancement, and otherwise engaging in actions designed to dissuade her from making or supporting complaint(s) and/or engaging in further protected activity, all of which caused Ms. Harris economic damages and ongoing emotional and psychological harm in violation of the anti-retaliation provisions of Title VII.

WHEREFORE, Ms. Harris demands judgment against Defendant and seeks the following relief:

A.    Economic damages;

B.    Compensatory damages;

C.    Prevailing party attorneys' fees, expenses, and costs;

D.    Pre and Post-Judgment interest; and

E.    Such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

**COUNT TWO**
**RETALIATION- TITLE VII**
(Retaliation in the Discharge of Employment)

19

117.    Ms. Harris incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

118.    At all times relevant to this Lawsuit, Ms. Harris was an "employee" and the Agency was an "employer" within the meaning of Title VII.

119.    During the times specified in the Lawsuit and this Complaint, Ms. Harris repeatedly engaged in protected activity by opposing, complaining and raising the Agency's illegal and discriminatory and harassing practices, including but not limited to the filing of a formal agency EEO complaint.

120.    Title VII makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding.

121.    The Agency violated Ms. Harris's right to equal employment opportunity by discharging her, all of which caused Ms. Harris economic damages and ongoing emotional and psychological harm in violations of the anti-retaliation provisions of Title VII.

WHEREFORE, Ms. Harris demands judgment against Defendant and seeks the following relief:

A.    Economic damages;

B.    Compensatory damages;

C.    Prevailing party attorneys' fees, expenses, and costs;

D.    Pre and Post-Judgment interest; and

E.    Such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

## COUNT THREE
## RACE DISCRIMINATION- TITLE VII
(Discrimination in the Terms and Conditions of Employment)

122.    Ms. Harris incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

123.    At all times relevant to this Lawsuit and in this Complaint, Ms. Harris was an "employee" and the Agency was an "employer" within the meaning of Title VII.

124.    The conduct as alleged throughout this Lawsuit and this Complaint constitutes discrimination and disparate treatment on the bases of Ms. Harris's race and color (African American/Black) in violation of Title VII.

WHEREFORE, Ms. Harris demands judgment against Defendant and seeks the following relief:

A.    Economic damages;

B.    Compensatory damages;

C.    Prevailing party attorneys' fees, expenses, and costs;

D.    Pre and Post-Judgment interest; and

E.    Such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

## COUNT FOUR
## RACE DISCRIMINATION- TITLE VII
(Discrimination in the Discharge of Employment)

125.    Ms. Harris incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

126.    At all times relevant to this Lawsuit and in this Complaint, Ms. Harris was an "employee" and the Agency was an "employer" within the meaning of Title VII.

127.    The conduct as alleged throughout this Lawsuit and this Complaint constitutes a discriminatory discharge on the bases of Ms. Harris's race and color (African American/Black) in violation of Title VII.

WHEREFORE, Ms. Harris demands judgment against Defendant and seeks the following relief:

A.    Economic damages;

B.    Compensatory damages;

C.    Prevailing party attorneys' fees, expenses, and costs;

D.    Pre and Post-Judgment interest; and

E.    Such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

## COUNT FIVE
## HOSTILE WORKING ENVIRONMENT - TITLE VII

128.    Ms. Harris incorporates by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

129.    At all times relevant to this Lawsuit and in this Complaint, Ms. Harris was an "employee" and the Agency was an "employer" within the meaning of Title VII.

130.    The conduct as alleged throughout this Lawsuit and in this Complaint constitutes unwelcome harassment on the bases of race and color, which was severe, pervasive and altered the conditions of Ms. Harris's employment by creating an abusive atmosphere.

131.    The Agency knew about the hostile work environment against Ms. Harris because she repeatedly complained to management and engaged in protected activity such as filing an EEO complaint designed to cause an investigation to stop the offending conduct.

132.    The Agency failed to take action, which allowed the continuing discrimination and retaliation against Ms. Harris.

133     The Agency violated Ms. Harris's right to equal employment opportunity by allowing and failing to rectify a hostile work environment based on her race and color in violation of Title VII, which environment became increasingly caustic and harmful, all the while causing Ms. Harris ongoing emotional and psychological harm.

WHEREFORE, Ms. Harris demands judgment against Defendant and seeks the following relief:

A.    Economic damages;

B.    Compensatory damages;

C.    Prevailing party attorneys' fees, expenses, and costs;

D.    Pre and Post-Judgment interest; and

E.    Such other penalties and monetary, declaratory, and equitable relief as the nature of her causes may permit.

## **DEMAND FOR TRIAL BY JURY**

Ms. Harris demands a trial by jury in this action.

Respectfully Submitted,

_____
Paula M. Potoczak (VSB 23208)
Law Office of Paula M. Potoczak
218 North Lee Street, Third Floor
Alexandria, Virginia  22314
(703) 519-3733 (Telephone)
(703) 519-3827 (Facsimile)
Email:  pmplaw@earthlink.net

Date:  October 26, 2020